1
2
3
4
5
6
7
8
9
10

11          **UNITED STATES DISTRICT COURT**

12          **SOUTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| CATHY ALATORRE, | Case No. 13-cv-1702 BAS (DHB) |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| RAYMUND E. MABUS, Secretary, Department of the Navy, | **[ECF 34]** |
| Defendant. | |

20          Before the Court is Defendant Raymund E. Maybus' Motion for Summary

21  Judgment. ECF 34. After reviewing the papers and hearing oral argument on the

22  Motion, the Court **GRANTS** summary judgment for the following reasons and

23  **DISMISSES WITH PREJUDICE** Plaintiff Cathy Alatorre's Complaint. ECF 1.

24                              **INTRODUCTION**

25          This case demonstrates the perils of an office romance. It is undisputed that

26  Plaintiff and Mr. Bergamini had a consensual dating relationship both before and

27  during her employment at Camp Pendleton. Clearly the relationship was

28  tumultuous. Plaintiff says the relationship existed largely because of pressure and

fear of losing her job, but she presents no evidence to support this theory. In fact, Plaintiff had no adverse consequences at her job when she was on the "off" part of her "on-again/off-again" relationship and received nothing but positive reviews throughout her tenure at Camp Pendleton.

Plaintiff seems more troubled by the gossiping and harassing conduct of her coworkers who she claims either resented her privileged status because of her perceived relationship with Mr. Bergamini or intervened and encouraged her to date Mr. Bergamini when she was not inclined to do so. Plaintiff complained to her supervisors about items moved or changed in her office, car tampering and off-color jokes distributed in the office. According to the undisputed facts, the Navy attempted to address Plaintiff's concerns about this perceived harassment. Title VII does not require that an employer be liable for failing to control office gossip or the prurient interest of coworkers in an inter-office affair. Accordingly, this Court **GRANTS** the Navy's Motion for Summary Judgment on Count One of the Complaint. ECF 1.

Plaintiff also alleges she was retaliated against both because she opposed sexual harassment at her job and because she participated in an EEOC investigation after she reported harassment to the EEO Office on May 31, 2012. First, Plaintiff fails present any evidence that before May 31, 2012, she opposed sexual harassment or discrimination. Second, Plaintiff fails to present any evidence that she faced any adverse employment action by her employer. Finally, to the extent Plaintiff brings new claims that her job duties were decreased and she was relegated to taking on-line courses for months on end, these claims were never raised in the EEO Complaint, and therefore Plaintiff has failed to exhaust her administrative remedies. Thus, this Court **GRANTS** the Navy's Motion for Summary Judgment on Count Two of the Complaint.

# STATEMENT OF FACTS

## A.    The Relationship

Plaintiff and Mr. Bergamini met for the first time when they were working at the Long Beach Naval Shipyard, sometime in either 1989 or 1990. Bergamini Dep. 117:24–25, ECF 36-1. They dated briefly. *Id.* at 119:15–25; Alatorre Dep. 170:9–172:12, ECF 36-2. Plaintiff describes Mr. Bergamini's behavior in Long Beach as "creepy" and "obsessive", and she claims she had to transfer job locations and move her personal residence to get away from him. Alatorre Dep. 172–81.

Nonetheless, in 2009, following the death of her daughter, Plaintiff reinitiated contact with Mr. Bergamini via his son. Bergamini Dep. 123; Alatorre Dep. 164. They began talking frequently on the telephone. Alatorre Dep. 167. With the assistance of Mr. Bergamini, Plaintiff applied to work at Camp Pendleton, where Mr. Bergamini was working. Bergamini Dep. 124–25; Alatorre Dep. 192, 200. In August 2009, Plaintiff was successful at getting the job at Camp Pendleton and began working at the Naval Facilities Maintenance Department ("FMD"), which was Mr. Bergamini's department. Bergamini Dep. 131.

Mr. Bergamini was interested in rekindling a relationship with Plaintiff, but she expressed reluctance. Alatorre Email, ECF 50-2; Bergamini Dep., ECF 50-3; Bergamini Email, ECF 50-4. Even so, the two remained friends and had dinner on and off from 2009–2011. Alatorre Dep. 374. Some of these dinners were "probably" at Plaintiff's request since she and Mr. Bergamini were friends. *Id.* Sometimes they also met after work for a cup of tea or a small appetizer, but Plaintiff says whenever Mr. Bergamini raised romantic issues, she left. Alatorre Aff. ¶ 16, ECF 36-2. At Plaintiff's request, Mr. Bergamini went with her to look at apartments she was considering renting in San Diego. Bergamini Dep. 131; Alatorre Dep. 229.

Plaintiff claims Mr. Bergamini sexually harassed her at work throughout this time period, consisting of staring at her, repeatedly asking her for a date, hugging

her, grabbing her bottom, trying to kiss her, saying she was beautiful, calling and texting every day, and calling her into his office. Alatorre Dep. 435, 438; Alatorre Aff. ¶¶ 6–8,7[1], 16–22. Plaintiff felt overwhelmed by his conduct and told Mr. Bergamini she needed space. *Id.* ¶¶ 23–24. Despite her alleged rebuffing of Mr. Bergamini's advances, Plaintiff does not allege she suffered any adverse job actions during this time period.

According to Plaintiff, in March 2010, Mr. Bergamini was giving her more space and "we were getting along better." *Id.* ¶¶ 24–28. Thus, in August, 2010, they began talking about dating again. *Id.* ¶ 28.

However, on August 26, 2010, Plaintiff says they had a confrontation relating to Plaintiff's live-in boyfriend, Michael. Alatorre Dep. 435; Alatorre Aff. ¶¶ 23, 29. Plaintiff claims that during this confrontation "[Bergamini] called me an 'F'ing liar.' And I believe that he also said 'F'ing whore.'" Alatorre Dep. 435. Plaintiff says Mr. Bergamini also "grabbed my right arm and squeezed it very firmly. He let go and I left the office and went for a walk. When I returned to the office, he returned and began banging on the window. He yelled, 'Open this fucking door. Open this fucking door! I was frightened…." Alatorre Aff. ¶ 29.

For the next ten or eleven months, Plaintiff only ran into Mr. Bergamini from time to time, occasions Plaintiff believes Mr. Bergamini orchestrated. Alatorre Aff. ¶ 40. During this time period, Plaintiff received no adverse work consequences: she was not terminated, demoted, nor did she receive any negative work evaluations. When they saw each other, Mr. Bergamini apologized profusely for his behavior in August 2010 and "from the pressure, his position over me and work and the confusion, I gave in and dated him." *Id.*

The two then resumed dating at least from July to October 2011. Bergamini Dep. 244; Alatorre Dep. 441–43. Plaintiff says she thought she would be fired if

---

[1] The Court notes that there are two Paragraph 7s in this Affidavit, both of which are relevant.

she didn't date Mr. Bergamini because he "used his power to get me the job. He could use his power for me to lose the job." Alatorre Dep. 438. Plaintiff does not claim, however, that Mr. Bergamini ever threatened she would be fired or that her job situation was ever even raised during their relationship.

The relationship included consensual sexual relations. Bergamini Dep. 244; Alatorre Dep. 444. Plaintiff told Mr. Bergamini she loved him on several occasions. Alatorre Dep. 447. The two travelled together to Palm Springs and, in October 2011, to the East Coast where they met Plaintiff's family. Bergamini Dep. 278; Alatorre Dep. 442. The trip to the East Coast ended badly, and Plaintiff broke up with Mr. Bergamini after they returned. Bergamini Dep. 291–92; Alatorre Dep. 453–55. Again, following the break up, Plaintiff was not terminated, demoted, nor did she receive any negative work evaluations. Smith Decl., ECF 54-6.

**B.     The Work Environment**

At Camp Pendleton's FMD, where Plaintiff began working in 2009, her first line supervisor was Ray Hill. Bergamini Decl. 2, ECF 36-1. Her second line supervisor was Jeff Hunt. *Id.* Although Mr. Bergamini did not directly supervise her at first, she began working on Standard Operating Procedures ("SOPs"), and Mr. Bergamini was responsible at least in part for supervising this work. Bergamini Decl. 2; Hunt Dep. 66–69. After Mr. Bergamini and Plaintiff had a confrontation in August 2010, the supervision of her SOPs was transferred from Mr. Bergamini to Mr. Hunt. Alatorre Decl. ¶ 31.

Mr. Bergamini was a right hand man for the FMD and reported directly to Lieutenant Colonel Todd Kerzie. Hunt Dep. 14. Mr. Hunt was under the direct supervision of Mr. Bergamini. Longridge Aff. 4, ECF 36-7. Mr. Bergamini also supervised Mr. Hill. Hill Aff. 2, ECF 50-5.

The other employees in the FMD were suspicious of the relationship between Plaintiff and Mr. Bergamini. Hunt Dep. 58–61. Mr. Hill felt that "Mr. Bergamini hired his girlfriend from Long Beach." Hill Aff. 4. The coworkers knew

Plaintiff and Mr. Bergamini had a prior relationship and would watch the two go for frequent walks together at work. *Id.*; Hunt Dep. 86–89. In December 2009, when she wore a dress to work, Plaintiff claims that her coworker Mr. Grant teased her, saying "look, she has legs" and that Mr. Bergamini "will probably be in the office a dozen times to see her today." Alatorre Decl. ¶ 16.[2] Plaintiff complained to various supervisors about the gossiping that went on in the Department. Hunt Dep. 82–89. She was upset that "people were being immature and talking about things that really were not their business." *Id.* at 90–93.

In 2010, Plaintiff claims she asked her coworker Mr. Hunt (who reported directly to Mr. Bergamini) to keep Mr. Bergamini out of her office and to leave her alone. Alatorre Decl. ¶ 13. Mr. Hunt denies any receiving any complaints from Plaintiff that she was being sexually harassed or any requests to keep Mr. Bergamini out of her work space. Hunt Dep. 94–96, ECF 50-7; Hunt Decl. (Feb. 7, 2013) 1, ECF 50-8[3].

During this time period, Plaintiff says she also complained of Mr. Bergamini's harassment to several non-supervisory coworkers, including Mr. Monroe, Mr. Grant, and Ms. Longridge. Alatorre Decl. ¶¶ 13–18. They all wanted to gossip and give their advice about the relationship. *Id.*

On March 16, 2011, Plaintiff met with Mr. Hunt and Mr. Bergamini to complain about rude and harassing treatment from her colleagues, including: (1) Her direct supervisor, Mr. Hill, yelled at her and called her a prima donna; (2) she believed people entered her office in her absence; (3) things in her office were moved or removed; (4) her car was keyed; (5) her car tires were deflated, (6) people gossiped or acted like they were in "junior high",  ; and (7) she was offered a dead mouse in a candy wrapper. Hunt Decl. 81–86; Alatorre Decl. ¶¶ 32–39;

---

[2] Grant denies saying that Mr. Bergamini will probably be in the office a dozen times to see her today. Grant Decl. 2, ECF 36-6.

[3] Two Declarations from Mr. Hunt are cited herein. His February 2013 Declaration is referred to by page number, and his January 2015 Declaration is referred to by paragraph number.

Kerzie Dep. 37–40. She complained that someone slipped an article about a commander's improper hiring of his favorite person, entitled "Office of Special Counsel Prosecutes HR Specialists for Allegedly Helping Agency Candidate Preselect a Candidate" implying Plaintiff was improperly hired. Alatorre Decl. ¶32. Notably, she does not allege she complained about Mr. Bergamini's conduct. After complaining about these actions, Mr. Hunt and Mr. Bergamini fitted her office with a lock that only she and the locksmith could open. Hunt Decl. 2.

At the end of January and into the beginning of February 2012, Plaintiff renewed her complaints about the harassment of her coworkers and took them to Lt. Col. Kerzie. Hunt Decl. 2. Again, she complained that things were being moved in her office, her car had been keyed, and her cell phone's disappearance. Kerzie Dep. 37–39. None of the complaints referred to Mr. Bergamini. *Id.* None of the complaints referred to sexual conduct. *Id.* Lt. Col. Kerzie encouraged Plaintiff to file an EEO complaint. Hunt Dep. 196. She was hesitant and elected not to do so. *Id.* Therefore Lt. Col. Kerzie opted to move her office out to the Public Works Department. *Id.* at 211. He explained to her that he could not do more unless formal charges were filed. Hunt Decl. 4.

Plaintiff remained in the Public Works Department until May 21, 2012, when Mr. Hunt decided that things had calmed down enough that perhaps the dysfunctional unit could start working together again. Hunt Dep. 213. Plaintiff agreed. Hunt Decl. (Jan. 10, 2015) ¶ 15, ECF 34-3. When Plaintiff's office returned to the FMD, Mr. Hunt summoned all employees for a meeting at which he "explained that no harassment would be tolerated … and the level of professionalism [he] expected." *Id.* ¶ 16.

Once she returned to the FMD, Plaintiff received two emails ostensibly sent from her coworker Mr. Grant. The two emails consist of two separate "jokes." The first addressed "[t]o all dog lovers" depicts photographs of twenty-five different dogs with hierarchical labels such as "CEO", "lower level manager", "intern" and

activity labels such as "at home after work", "Friday night" "after company event", "sick leave". "Office" Email, ECF 36-3. Nothing is overtly sexual or sexist in these photographs. Plaintiff explained she found something in the photos to be sexually offensive but she "can't explain it." Alatorre Dep. 500. She gave "The Intern" dog photo as an example, stating it reminded her of "how females are treated at FMD, just as objects. We're just supposed to be cute little things that sit there." *Id.* at 504. However, she admitted that there were no interns, either male or female, at FMD. *Id.* This email was sent to several colleagues, not just to Plaintiff. Plaintiff says she told Mr. Grant she didn't want any more jokes forwarded to her, and he said "noted." Alatorre Dep. 497.

The second email was forwarded from Mr. Grant's address only to Plaintiff. Mr. Grant adamantly denies forwarding this to Plaintiff, as he would need a "death wish" to send it to her. Grant Aff. 3, ECF 36-6. Nevertheless the email consists of 24 pages showing photos of notes to "bad roommates" and is titled "It's summer, say goodbye to your annoying roommates." "Roommate" Email, ECFs 36-4–5. Among notes about not eating each other's food or waking each other too early are two sexually suggestive notes: one saying "Eric—I had sex in your bed. Sorry about that. Don't use your pillow.—Matt" and one directed "to the individual obsessed with drawing penises", which goes on to indicate how unamusing the writer finds the drawing to be with a hand-drawn penis overlaid on the notice. *Id.* There are several other inappropriate jokes about keeping urine in the refrigerator and passing out naked in the bathroom. *Id.*

On May 31, 2012, after receiving these two emails, Plaintiff filed a complaint with the EEO Office. EEO Complaint (Sep. 11, 2012), ECF 36-9. In this Complaint, the only act of retaliation listed is "an inquiry by Al White, asking me to give a message to Ernest Grant following my complaint to the EEO Office about Grant's misconduct." *Id.* at 2. There is no mention in the Complaint of Plaintiff's claim that she was forced to write SOPs, which was out of her job description, or

that her career was derailed and she was forced to do nothing but take courses on-line.

Mr. Bergamini and Mr. Grant were immediately placed on administrative leave while the complaint was being investigated. Hunt Decl. ¶¶ 20, 27. At Plaintiff's request, she was also moved back to the Public Works Department so she could be away from those she claimed were harassing her. *Id.* The Navy hired a former EEOC Administrative Law Judge to conduct a thorough investigation of Plaintiff's Complaint, resulting in a 1036 page report and including interviews conducted with multiple witnesses. Panchadsaram Decl. ¶ 32, ECF 34-4. A copy of the report was given to Plaintiff. She requested a hearing before the EEOC, but this lawsuit was filed before the EEOC could hear her case. *Id.* ¶ 33. Mr. Grant eventually received a letter of caution relating to his misuse of government equipment for sending inappropriate emails to fellow employees. Hunt Decl. ¶¶ 27–28; Letter of Caution, ECF 36-8.

Plaintiff never received a negative evaluation at work. Hunt Dep. 80. Despite the "on again/ off again" nature of her relationship with Mr. Bergamini, and despite Plaintiff's stated fear that "there would be a very good possibility I would be fired if I didn't date Mr. Bergamini," Plaintiff was never threatened with any adverse employment action, nor did she in fact receive any adverse employment action throughout her tenure at the FMD. Alatorre Dep. 437–39; Smith Decl.; Hunt Dep. 78–81.

## C.     The Navy's Anti-Sexual Harassment Policy

The Department of Navy issued a Discrimination Complaints Manual in November 2006, providing guidance for processing discrimination complaints at places like Camp Pendleton. Panchadsaram Decl. ¶ 9; Navy Discriminations Complaints Manual, ECFs 36-10 and 36-11. In July 2009, an additional order was issued discussing the EEOC's anti-harassment policy, including procedures an EEO officer must follow when an employee makes an allegation of sexual

harassment at Camp Pendleton. Panchadsaram ¶ 10; EEO Program Order 12713.1, ECF 36-12.

These policies and procedures were widely disseminated to Camp Pendleton employees. Panchadsaram Decl. ¶ 13. They were discussed as part of the new employee orientation that Plaintiff completed. Panchadsaram Decl. ¶¶ 13, 16; New Employee Orientation Handbook, ECF 36-13; New Employees Orientation Slideshow, ECF 36-14. They are posted on bulletin boards throughout the base. *Id.* Finally, all employees are mandated to take yearly Prevention of Sexual Harassment training ("POSH"), which includes procedures for reporting sexual harassment to the EEO Office and requires reporting to an EEO counselor within 45 days. Panchadsaram Decl. ¶ 14; POSH No Fear Act 2002 Training, ECF 36-15. Again, Plaintiff completed this yearly training. Panchadsaram Decl. ¶ 16; Certificate of Completion, ECF 36-16.

The Navy has a fully-staffed EEO Office at Camp Pendleton. Panchadsaram Decl. ¶ 21. There is always an EEO counselor on site whose job is tasked with receiving complaints from civilian employees at Camp Pendleton. *Id.* The EEO office is located on a main thoroughfare of the base, and a sign visible from this road identifies the "EEO Office." Panchadsaram Decl. ¶ 22. The telephone number to reach an EEO Counselor is also posted throughout the base. *Id.*

## ANALYSIS

### A.    Summary Judgment

Summary Judgment is appropriate under Rule 56(c) when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable

1   jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

2       A party seeking summary judgment always bears the initial burden of

3   establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

4   323. The moving party can satisfy this burden in two ways: (1) by presenting

5   evidence that negates an essential element of the nonmoving party's case; or (2) by

6   demonstrating that the nonmoving party failed to make a showing sufficient to

7   establish an element essential to that party's case on which that party will bear the

8   burden of proof at trial. Id. at 322–23. "Disputes over irrelevant or unnecessary

9   facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac.*

10   *Elec. Contractors Ass'n*, 809 F.2d 626 630 (9th Cir. 1987).

11       When making this determination, the court must view all inferences drawn

12   from the underlying facts in the light most favorable to the nonmoving party. See

13   *Matsushita Electric Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 586, 587

14   (1986). "Credibility determinations, the weighing of evidence, and the drawing of

15   legitimate inferences from the facts are jury functions, not those of a judge, [when]

16   he [or she] is ruling on a motion for summary judgment." *Anderson,* 477 U.S. at

17   255.

18   **B.**    **Title VII – Sex Discrimination and Harassment**

19       In her first cause of action, Plaintiff sues her employer, the Navy, for

20   "continuing sex discrimination and sexual harassment in violation of Title VII."

21   Compl., ECF 1. Plaintiff claims she was "subjected to inappropriate sexual

22   misconduct and assault by male supervisors and employees." *Id.* ¶ 44d. Plaintiffs

23   may state claims for harassment against an employer under either a vicarious

24   liability or negligence theory. *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th

25   Cir. 2001). Vicarious liability applies when the harasser is a supervisor, while

26   harassment by coworkers must be accompanied by the employer's negligence. *Id.*

27   Plaintiff alleges harassment by both her supervisors and her coworkers; therefore

28   the Court analyzes her claim under both theories.

### a. Harassment by a Supervisor

An employer is liable for the actionable discrimination of a supervisor if: (1) there was actual knowledge of the discrimination by high-echelon officials; (2) the harassing individual is the president or CEO, such that he is the organization's proxy; or (3) the discriminatory action leads to a tangible employment action (for example hiring, firing, lack of promotion, change in compensation, detrimental change in work assignment). *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).

In *Holly D. v. California Institute of Technology*, 339 F.3d 1158 (9th Cir. 2003), the plaintiff agreed she had performed sex acts with the professor for whom she worked. However, she claimed the sex was unwelcome, and that the professor implied that employment was contingent on acquiescing to his sexual advances. The Ninth Circuit ruled the plaintiff failed to establish a tangible adverse employment action. "[S]uch unconditional liability attaches only if a quid pro quo threat is implemented by some form of sufficiently concrete employment action. An unfulfilled, or inchoate, quid pro quo threat by a supervisor is not enough; something more is required. *Id.* at 1170 (footnotes omitted). "Such a claim may lie either when continued employment has been expressly conditioned on participation in sexual acts or when the supervisor's words or conduct would communicate to a reasonable woman in the employee's position that such participation is a condition of employment." *Id.* at 1173. Implicit allegations "require more than conclusory allegations that the supervisor proposed a sexual liaison and the employee responded to the overtures in order to protect her employment interests." *Id.* at 1174. Thus, the district court properly granted summary judgment because the plaintiff failed to link the professor's sexual requests with any discussion of her job duties. Similarly, there was no evidence that the professor ever mentioned any potential change in her employment status, or indeed any other job-related discussion, while participating or discussing the claimed sex acts.

1  In this case, as in *Holly D.*, Plaintiff cannot claim her relationship with Mr.
2  Bergamini resulted from a quid pro quo threat of adverse action. Indeed, Plaintiff is
3  adamant that her employment with FMD was not the product of any special
4  favoritism or preferential treatment from Mr. Bergamini. She similarly fails to
5  allege that her employment was discussed during the relationship or connected to it
6  in any way. Instead, she now attempts to assert that her consensual, though
7  tumultuous, relationship was not only unwanted but should have been interfered
8  with by the Navy. Because the Navy had no actual knowledge of the alleged
9  harassment, it cannot be held liable for it.

10  Plaintiff did not report Mr. Bergamini's alleged harassment to any officials
11  with authority over Mr. Bergamini until May 2012. She claims she complained to
12  her coworkers and to Mr. Hunt, but Mr. Hunt was under Mr. Bergamini's direct
13  supervision. It is unreasonable to assume that Mr. Hunt had any real authority to
14  curtail Mr. Bergamini's conduct. "Actual knowledge" requires that "someone with
15  authority to address the problem is notified." *See Sharp v. City of Houston,* 164
16  F.3d 923, 930 (5th Cir. 1999) (quotations omitted). "This includes someone with
17  the power not only to hire and fire the offending employee but also to take
18  disciplinary action…to instruct the offending employee to cease the harassing
19  behavior or to implement other means of taking remedial action." *Id.* In fact,
20  despite the allegations that she was being continually sexually harassed by Mr.
21  Bergamini from 2009 until 2012, she regularly took walks with him, had dinner
22  with him, met with him after work, and eventually slept with him and repeatedly
23  told him she loved him. From all outside appearances, and from her employer's
24  perspective, Plaintiff appeared to be friendly with Mr. Bergamini (as she admits
25  she was) and not suffering from harassment. Alatorre Dep. 374.

26  When her friendly relationship with Mr. Bergamini deteriorated in August
27  2010, the Navy transferred her supervision from Mr. Bergamini to Mr. Hunt.
28  Alatorre Decl. ¶ 31. She continued to work on SOPs after her transfer. Following

– 13 –

the transfer, Plaintiff's relationship with Mr. Bergamini was sufficiently rehabilitated to the point that she decided to resume dating him. Alatorre Dep. 441–43, Alatorre Decl. ¶¶ 40–43; Bergamini Dep. 244. Plaintiff has failed to show either that she attempted to inform an official with authority or that those officials should have had constructive knowledge of any harassment.

Furthermore, Plaintiff suffered no tangible employment action prior to May 2012. An adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In this case, Plaintiff never received any threat of or any adverse employment action while she was employed at Camp Pendleton. She received nothing but good evaluations at work. Hunt Dep. 80. Despite the fitful nature of her relationship with Mr. Bergamini, Plaintiff does not allege she was ever demoted, terminated, passed over for promotion, or reassigned, nor was her compensation or benefits reduced in any way. Smith Decl. Plaintiff does not claim that Mr. Bergamini ever threatened or even mentioned her job situation during their relationship.

If the Plaintiff does not show actual knowledge or an adverse employment decision, an employer may still be strictly liable for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. However, the employer may assert an affirmative defense, written into law by the Supreme Court in *Faragher v. City of Boca* Raton, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). This affirmative defense looks at the reasonableness of the employer's conduct and that of the plaintiff victim. *Holly D.*, 339 F.3d at 807; *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 348 (6th Cir. 2005).

An employer may show "that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur and that the complaining

employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." *Holly D.*, 339 F.3d at 805. The defense requires the employer to show by a preponderance of the evidence "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807. The fact that an employer had promulgated an anti-harassment policy with a complaint procedure is relevant to prong one, and proof that an employee failed to use any of this complaint procedure is relevant on two. *Id.*

Simply having a policy is insufficient; the Court must look to the implementation of that policy as well. *Clark*, 400 F.3d at 349 ("Prong one of the affirmative defense requires an inquiry that looks behind the fact of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.") An effective policy should at least: (1) require supervisors to report instances of sexual harassment; (2) permit both formal and informal complaints; (3) provide a mechanism for bypassing a harassing supervisor; and (4) provide for training regarding the policy. *Id.* A reasonable policy on paper is not helpful if none of the supervisors who witness a harasser's conduct take corrective action. *Id.*

In *Holly D.*, the Ninth Circuit found that Caltech had established that it had exercised reasonable care to prevent and promptly correct any sexually harassing behavior. The school: (1) had a written policy; (2) had identified contact personnel to whom a victim could report sexual harassment; (3) had established procedures to investigate and resolve and claims; (4) had made the policy available in several publications including one given to Holly; and (5) Holly knew about the training and how to report sexual harassment. *Id.* at 1177. The fact that, after Holly reported the sexual harassment, the school failed to follow all possible leads did

1   not undermine the fact that substantial investigation was done and it was

2   reasonable. *Id.* at 1178. "The legal standard for evaluating an employer's efforts to

3   prevent and correct harassment, however, is not whether any additional steps or

4   measures would have been reasonable, if employed, but whether the employer's

5   actions as a whole established a reasonable mechanism for prevention and

6   correction." *Id.* at 1177. In addition, the Ninth Circuit found that Caltech had

7   established the second prong of the affirmative defense because Holly D. failed to

8   seek any relief or report sexual harassment of any kind until after a full year of

9   allegedly unwelcome sexual activity and almost two years after the first sexual

10  incident. *Id.* at 1178.

    In this case, the Navy has met its burden to establish the affirmative defense

11  of reasonable care. It is undisputed that the Navy has an extensive sexual

12  harassment policy that encourages employees to report all harassment to the EEO

13  Office. Plaintiff was undeniably trained in this policy on a yearly basis. Posters and

14  signs encouraged employees to report any sexually harassing conduct to the EEO

15  Office. Although Plaintiff's supervisor Lt. Col. Kerzie was not aware that Plaintiff

16  believed she was being harassed by Mr. Bergamini, he did know that she was

17  having problems with her coworkers moving things in her office and allegedly

18  keying her car, and he encouraged her to report her concerns to the EEO Office.

19  Hunt Decl. 194–97. The Navy has established uncontradicted evidence that it had

20  "a reasonable mechanism for prevention and correction" of sexual harassment and

21  thus has established the first prong of the affirmative defense.

    Furthermore, it is undisputed that Plaintiff failed to take advantage of this

22  policy. Despite alleging that she was harassed by Mr. Bergamini for three years,

23  culminating in her engaging in a sexual relationship with him from July to

24  October, 2011, she failed to complain about this relationship to anyone and failed

25  to report it to the EEO Office until May 31, 2012, many months after the

26  relationship had ended. Had Plaintiff complained about the allegedly harassing

behavior back in 2009, when she claims it began, she could have been transferred from the FMD long before her sexual relationship began. Since Plaintiff failed to seek any relief or report any sexual harassment by Mr. Bergamini until almost three years after she alleges it began, the Navy has established the second prong of the affirmative defense.

### b. Harassment by Coworkers

An employer may still be liable for the harassment of coworkers if Plaintiff shows a hostile work environment that management knew or should have known about and failed to take prompt, corrective action. *Swinton*, 270 F.3d at 803. A "hostile work environment" exists when sexual harassment is so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment'." *Faragher*, 524 at 786, quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Discourtesy or rudeness is insufficient. *Id.* at 787. Title VII is not a general civility code. *Id.* at 788; *EEOC v. Prospect Airport Services, Inc.*, 621 F.3d 991, 1000 (9th Cir. 2010) (A Title VII violation "is not established merely by evidence showing sporadic use of abusive language, gender-related jokes and occasional teasing.") The harassment must be more than episodic; it must be "sufficiently continuous and concerted in order to be deemed pervasive." *Id.*; *Westendorf v. West Coast Contractors of Nevada, Inc.*, 712 F.3d 417 (9th Cir. 2013) (remarks on women's breast sizes, comments about tampons and multiple orgasms, and the suggestion the plaintiff clean his trailer in a French maid's outfit are not sufficiently pervasive). The environment must be both subjectively and objectively offensive; that is, it must have offended the plaintiff in the case as well as be offensive to a reasonable woman in that environment. *Id.* The Supreme Court explains that Title VII "does not prohibit 'genuine but innocuous differences in the way men and women routinely interact with members of the same sex and the opposite sex.'" *Id.* at 788, quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

1    Thus, in order to prove a hostile work environment, plaintiff must show: (1)

2    she was subjected to verbal or physical conduct of a sexual nature: (2) the conduct

3    was unwelcome; and (3) the conduct was sufficiently severe or pervasive as to alter

4    the conditions of her employment and create an abusive work environment. *Porter*

5    *v. California Dept. of Corrections*, 419 F.3d 885, 892 (9th Cir. 2005).

6    In this case, the alleged behavior of Plaintiff's coworkers was insufficient to

7    show a hostile work environment. Although Plaintiff never complained about Mr.

8    Bergamini's behavior until May 2012, she did complain about the behavior of her

9    coworkers. On several occasions, Plaintiff met first with Mr. Bergamini and Mr.

10   Hunt, and later with Lt. Col. Kerzie and Mr. Hunt to complain that she was being

11   treated rudely by her immediate supervisor Mr. Hill, that coworkers were coming

12   into her office when she was not there any moving things around, that her car had

13   been tampered with, and that they continued to gossip about her. Plaintiff told Mr.

14   Bergamini, Mr. Hunt, and Lt. Col. Kerzie that she believed this was a hostile work

15   environment. However she refused to report it to the EEO Office, instead agreeing

16   that transferring her office to the PWD would be helpful. After several months she

17   agreed to come back to the FMD office. At that point, Plaintiff alleges she received

18   two unwanted joke emails that led her to report the situation to the EEO Office.

19   The concerns expressed by Plaintiff, even assuming they are all true, simply

20   fail to establish sexual harassment that is so severe or pervasive that it creates an

21   abusive working environment. Discourtesy, rudeness, gossip and teasing, and two

22   bad—even offensive jokes—are not sexual harassment. They may well have been

23   subjectively offensive, but Plaintiff has failed to establish that they were

24   objectively offensive. Furthermore, she has failed to establish that they were truly

25   sexual in nature. Her complaints seem primarily to revolve around tampering with

26   her office and car, offensive and disquieting, to be sure, but not sexual harassment.

27   Furthermore, her employer took appropriate corrective action. First, Mr.

28   Hunt arranged for her office to have a special key so only she and the locksmith

would have access. Hunt Decl. 2. When she finally reported her concerns to Lt. Col. Kerzie, he agreed to move her office to the Public Works Department where she would be separated from the problematic colleagues. Hunt Dep. 210–13. He explained that there was not much more he could do as long as she refused to file an EEO complaint. Hunt Decl. 1. When she agreed to have her office moved back to the FMD, Hunt summoned all employees for a meeting at which he "explained that no harassment would be tolerated." Hunt Decl. ¶ 16.

Plaintiff attempts to lump all conduct, including her coworkers' distribution of jokes about dogs and roommates, into one pervasively abusive work environment. But as the Ninth Circuit explains, "We refuse to mix recent discrete acts like tinder with the planks of ancient sexual advances and then, regardless of whatever it was that set the spark in the furnace, call the fire that ignites therefrom a hostile environment. If the flames of an allegedly hostile environment are to rise to the level of an actionable claim, they must do so based on the fuel of timely non-discrete acts." *Porter*, 419 F.3d at 893. In order to determine whether all acts in the workplace equal one unlawful employment practice we look at "whether the earlier and later events amounted to the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the same managers." *Id.* at 892, quoting *National RR Passenger Corp. v. Morgan,* 536 U.S. 10, 116 (2002).

Plaintiff fails to present evidence that she was subjected to a sexually hostile work environment that management knew or should have known about and failed to take prompt, corrective action. Her first cause of action therefore must fail. Accordingly, the Court **DISMISSES** Count One.

## C.     Title VII—Retaliation

In her second cause of action, Plaintiff alleges "continuing reprisal in violation of Title VII, 42 U.S.C. §2000e". Compl. According to her Complaint, Plaintiff alleges that Defendant retaliated against her because, since October 2009, she opposed sexual harassment and gender discrimination. Compl. ¶54. Plaintiff

claims retaliation for this opposition manifested itself when her employer:

- required her to return to the FMD office location in May, 2012;

- required her to perform SOP work that was inconsistent with her job title and/or description;

- allowed a campaign of hostility and harassment by coworkers and supervisors;

- failed to provide job security;

- failed to provide a safe or respectful work environment;

- failed to provide other employment opportunities and benefits.

Compl. ¶ 55. Plaintiff further alleges that she was retaliated against because she reported her hostile work environment to the Camp Pendleton Equal Employment Opportunity Office on May 31, 2012. Compl. ¶ 35. After May 31, 2012, Plaintiff claims she was denied the opportunity to progress in her career as a Facilities Operations Specialist or Technical Writer and relegated to taking on-line computer courses for months on end. Compl. ¶ 35.

"In order to establish a prima facie case of retaliation, [a victim] must demonstrate that (1) she had engaged in a protected activity; (2) she was thereafter subjected by her employer to an adverse employment action and (3) a causal link existed between the protected activity and the adverse employment action." *Porter*, 419 F.3d at 894. For the first prong, a Plaintiff may assert she opposed an unlawful practice (the "opposition clause") or that she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" pursuant to Title VII (the "participation clause"). Title VII §704(a), 42 U.S.C. §2000e; *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). "[T]he opposition clause, by its terms, protects only employees who oppose what they reasonably perceive as discrimination *under the Act*. An employee need not establish that the opposed conduct in fact violated the Act in order to establish a valid claim of retaliation…. However, the opposed conduct must fairly fall within the protection

1   of Title VII to sustain a claim of unlawful retaliation." *Learned*, 860 F.2d at 932.

2       The second prong of an "adverse employment action is one that 'constitutes

3   a significant change in employment status, such as hiring, firing, failing to

4   promote, reassignment with significantly different responsibilities, or a decision

5   causing a significant change in benefits." *Collins v. Potter*, 2010 WL 5376221 *5

6   (S.D. Cal. 2013), citing *Ellerth*, 524 U.S. at 761.

7       Finally, in order to litigate a claim under Title VII in federal district court,

8   Plaintiff must have exhausted her administrative remedies. *Greenlaw v. Garrett*, 59

9   F.3d 994, 997 (9th Cir. 1995). "The jurisdictional scope of a Title VII claimant's

10  action depends upon the scope of both the EEOC charge and the EEOC

11  investigation." *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994). In

12  other words, "[e]xhaustion depends upon the 'fit' between the administrative

13  claim, the investigation and any subsequent allegations." *Greenlaw*, 59 F.3d at

14  1000. The EEOC charge does not strictly limit the federal court case, rather the

15  scope of the civil action is limited to the scope of the administrative investigation

16  that could reasonably be expected to follow the retaliation charges listed in the

17  EEOC charge. *Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124, 132 (4th Cir.

18  2002). This "affords the EEOC the first opportunity to investigate the alleged

19  [retaliatory] practices to permit it to perform its role in obtaining voluntary

20  compliance and promoting conciliation efforts." *Babrocky v. Jewel Food Co.,* 773

21  F.2d 857, 863 (7th Cir. 1985) (quotation omitted).

22      In this case, Plaintiff first alleges a violation of the opposition clause,

23  claiming that she opposed gender and sex discrimination and that, as a result, her

24  employer retaliated against her. The problem with these allegations is two-fold.

25  First, the complaints Plaintiff made to her employer before May 31, 2012 did not

26  involve sexual harassment or gender or sex discrimination. In March 2011, when

27  Plaintiff alleges she met to complain about the harassment of her colleagues, her

28  complaints included: (1) being yelled at and called a prima donna by her direct

supervisor Mr. Hill, (2) people entering her office when she was not there, (3) things being moved and removed from her office, (4) her car being keyed, (5) her car tires being deflated, (6) people gossiping about her having a facelift, and (7) being offered a dead mouse in a candy wrapper. Hunt Dep. 82–85; Alatorre Decl. ¶¶ 33–39; Kerzie Dep. 37–40. She further complained that colleagues suggested she had been improperly hired because of her earlier friendship with Mr. Bergamini. Alatorre Decl. ¶ 32. Notably absent from these complaints is anything to do with sexual or gender harassment.

At the end of January, beginning of February 2012, Plaintiff renewed her complaints about the harassment of her coworkers and took them to Lt. Col. Kerzie. Hunt Decl. 2. Again, she complained that things were being moved in her office, her car had been keyed, and her cell phone misplaced or taken or hidden. Kerzie Dep. 37–40. None of the complaints involved sexual conduct or gender discrimination. Because Plaintiff did not oppose discrimination under Title VII at this point in time, she fails to meet the first prong of a retaliation claim.

Additionally, Plaintiff fails to show that she suffered any adverse employment action at this point in time. The alleged "adverse employment actions" listed in her Complaint include: moving her office location, allowing continued hostility and harassment by coworkers, failing to provide a safe and respectful work environment, but none of these involve hiring, firing, failing to promote, or reassignment. Although Plaintiff does allege Defendant failed to provide other employment opportunities and benefits and failed to provide job security, there is no evidence that she lost employment opportunities, benefits, her job, or her assignment as the result of her complaints about her co-workers.

Finally, Plaintiff alleges that her opposition to her coworkers' harassment led the Navy to assign her SOP work that was inconsistent with her job description and that after May 31, 2012, her career was derailed and she was relegated to taking on-line courses for months on end. To determine whether these claims were

administratively exhausted and therefore properly before this Court, the Court looks to the "fit" between the administrative claims, the investigation, and any later allegations. *Ong v. Cleland*, 642 F.2d 316, 318 (9th Cir. 1981). "Fit" exists when the newly alleged acts are "like or reasonably related to the allegations of the [agency] charge, including new acts occurring during the pendency of the charge before the [administrative agency]." *Id.* (alteration in original) (internal quotations omitted). These new allegations of retaliatory job placement are radically different from the allegations in the EEO Complaint. Unlike her EEO Complaint, these allegations involve her supervisors committing retaliatory actions instead of coworkers' creation of a hostile work environment. While her EEO Complaint may have led to these alleged retaliations, the EEOC had no opportunity to investigate any adverse assignments. These claims are not exhausted and therefore not before this Court.  Accordingly, the Court **DISMISSES** Plaintiff's Second Count.

## CONCLUSION

For the foregoing reasons, this Court **GRANTS** Defendant's Motion for Summary Judgment. Accordingly, the Court **DISMISSES** the matter **WITH PREJUDICE**.

**IT IS SO ORDERED.**

Dated: May 8, 2015

Hon. Cynthia Bashant
United States District Judge